UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| AHMED R MORNING #378188 | CIVIL ACTION NO. 19-cv-348 SEC P |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| DARREL VANNOY | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

### Introduction

A Bossier Parish jury, by a 10-2 vote, convicted Ahmed Rashad Morning ("Petitioner") of aggravated rape, and he received a mandatory life sentence. His conviction and sentence were affirmed on direct appeal. State v. Morning, 149 So.3d 925 (La. App. 2d Cir. 2014). He filed a writ application with the Louisiana Supreme Court. It was initially denied as untimely, but the court granted reconsideration and summarily denied the writ application. State ex rel. Morning v. State, 176 So.3d 396, 186 So.3d 1179 (La.). The state courts also denied a post-conviction application. Petitioner now seeks federal habeas corpus relief based on (1) insufficient evidence, (2) excessive sentence, (3) ineffective assistance of trial counsel, and (4) ineffective assistance of appellate counsel. For the reasons that follow, it is recommended that the petition be denied.

### Sufficiency of the Evidence

**A. Introduction**

Petitioner was charged with aggravated rape under La. R.S. 14:42(A)(3), which defined the crime to include a rape committed where the sexual intercourse is deemed to

be without lawful consent of the victim because the victim is prevented from resisting the act because the offender is armed with a dangerous weapon. The victim in this case was T.A.C., who petitioner contacted through an ad on backpage.com and met in a motel. Petitioner's main argument is that it was a consensual encounter with a prostitute who claimed rape based on a fee dispute. His argument rests largely upon an assessment of the credibility of the victim and her friend.

### B. T.A.C. (Tr. 361-414)

The victim, T.A.C., testified that she and her friend Kimberly Fisher traveled from Dallas to the Shreveport/Bossier area to work as escorts who received "donations for companionship." She denied that she had ever exchanged sex for money, but she did allow on redirect that it was possible for there to be consensual sex during a visit. T.A.C. and Ms. Fisher placed an ad on backpage.com, Petitioner called T.A.C. based on the ad, and she asked for a $100 donation for a half hour meeting. They met at America's Best Value Inn in Bossier City.

T.A.C. testified that Petitioner seemed nervous when he encountered both her and Ms. Fisher in the room, so T.A.C. asked Fisher to leave. T.A.C. said that she talked with Petitioner for several minutes and asked him for the donation multiple times. He commented that he was nervous because he had "just got popped for this at the Horseshoe Hotel." T.A.C. is white, and Petitioner commented that it was a white girl who got him arrested. Petitioner kept asking T.A.C. if she was the police and why she kept asking for the money. T.A.C. eventually told Petitioner that he had to go. Petitioner said he needed to use the bathroom, and he came out of the bathroom holding a knife.

T.A.C. said that the knife was a big kitchen knife like the ones that come in a block, and it had a black handle. Petitioner grabbed T.A.C.'s cell phone, and he pulled the phone cord out of the wall for the motel room phone. He demanded that T.A.C. tell him where her money was or she was going to die. He raped T.A.C. vaginally, anally, and orally. He told her that she was going to die and, "I'm getting you back for the white bitch that got me in trouble."

T.A.C. led Petitioner to believe that Kimberly Fisher had their money, so he demanded that T.A.C. call Fisher and have her return. T.A.C. made the call and used the phrase "two girl special," which was their code phrase to indicate trouble.

Ms. Fisher returned and knocked on the door. Petitioner looked out the peephole and confirmed it was her. T.A.C., who was nude, convinced Petitioner to let her open the door so that Kimberly would not be suspicious. Petitioner stood behind T.A.C. with the knife. T.A.C. testified that she opened the door so hard that it hit Petitioner; she took off running and pushed Ms. Fisher along with her. T.A.C. ran to the motel office screaming, in hopes that someone would call the police. Motel management did so, and they put T.A.C. in a room where she would be safe. The police arrived, questioned her, then took her to the hospital for examination.

T.A.C. admitted that she first told police that she left her door unlocked, and Petitioner came in the room and raped her. The officers later told her that they knew about her backpage ad, so she admitted that she was an escort and gave essentially the version of events she testified to at trial. T.A.C. said that she had been under the impression that

prostitution was a felony, and she wished to avoid any risk of such an arrest, even though she thought her escort service was legal.

### C. Kimberly Fisher (Tr. 310-54)

Kimberly Fisher described the escort operation and how Petitioner arrived at the motel room. She said that she left the room to do some shopping and had been gone about 45 minutes when she received a call from T.A.C. saying that Petitioner would like a "two girl special," which was their code phrase meaning something was wrong. She had also received another call from T.A.C., but the phone disconnected. She also thought that her friend sounded distraught. She returned to the room and, instead of using her key, banged on the door.

Ms. Fisher testified that she heard a lot of shuffling behind the door, and she backed up to the sidewalk. It took a couple of minutes, but T.A.C. opened the door, and her face was pale white. She was crying, and she immediately slammed the door into Petitioner, who was behind the door, and said, "Run, he has a knife. He's trying to kill us." Ms. Fisher then saw a glare from the knife, and she ran. Fisher said that Petitioner ran up beside her, smiled like he "just won a million dollars," and said, "That bitch is crazy." The whole time, he was holding the "butcher knife" up in the air.

Meanwhile, T.A.C. was screaming for help and yelling that Petitioner had raped her, had a knife, and was trying to kill her. Fisher said that Petitioner began to go after T.A.C. but stopped when he saw a security camera. Fisher ran to the parking lot and locked herself inside her car. From there, she saw Petitioner run back to the motel room, grab T.A.C.'s cell phone, his cigarettes and beer, and put the knife in his back pocket. She saw him run

for his car, and she drove up behind the car and wrote down the license plate number. Petitioner sped away.

Ms. Fisher admitted that she first lied to the police that she must have left the door open when she left to go to McDonald's, which led to the man entering the room. She said she lied because she was scared of going to jail for escorting. Later that day, when the police told her they knew about the backpage ad, she told them the version of events she testified to at trial.

### D. Viral Patel (Tr. 228-34)

Viral Patel testified that he was working at the front desk of the motel that day. He was in the back office when he heard T.A.C. yelling for help. He went out and saw her running naked in the lobby, so he told his desk clerk to call the police, and he let T.A.C. in the model room that was near the office. He said she was crying, scared, and shaking. The motel surveillance system recorded T.A.C. running down the hall, and the video was played for the jury.

### E. Police Officers

Several police officers testified that they were dispatched to the hotel in response to a report of a rape. They encountered T.A.C., who was upset, crying, and shaking. She described the suspect as a black male with tattoos in his early 30s. T.A.C. first said that she was in the bathroom when the man came into her room and raped her at knife point.

Two detectives testified that when they confronted T.A.C. about her and Ms. Fisher's backpage ads, T.A.C. began to cry and said she did not want to tell them she was an escort because she did not think they would believe her report. She then described the

events similar to the testimony she gave at trial. Ms. Fisher also confessed that her initial story was false because she did not want to admit that the women were escorts.

The detectives processed the women's motel room. The telephone had been pulled from the wall. The officers found marijuana, condom wrappers, and other items. One officer said that the video surveillance showed T.A.C. "running at a dead full speed sprint down that hallway … completely naked."

A check of the license plate number written down by Ms. Fisher indicated that the car was registered to a black female with the last name Morning, with a Shreveport address. An officer performed a computer search for a black male in the right age range with the last name of Morning. It produced Petitioner, along with his photo that matched the victim's description. Other reports came up regarding Petitioner, including an incident at the Horseshoe Casino that involved prostitution. When officers searched Petitioner's residence, they found two knives that matched the description T.A.C. gave and shoes that matched T.A.C.'s description of what the rapist was wearing.

Petitioner waived his Miranda rights and told a detective that he set up a date with T.A.C. He said they used cocaine and marijuana but did not have sex at any point. For some reason, T.A.C. freaked out and ran out of the room naked, and he got his keys and his $40 and left. Petitioner denied having a knife.

### F. Melissa George (Tr. 285-98) & Robert Perry (Tr. 299-309)

Melissa George is a police officer. She testified that she was working undercover in a prostitution operation at the Horseshoe Casino in June 2012, a couple of months before the August 2012 incident at issue in this case. Officers placed an advertisement on

backpage that offered sex acts for money. George received a call from Petitioner in response to the ad, and they agreed on a price of $140. She met Petitioner in the lobby of the Horseshoe hotel and took an elevator to the room. They sat down on the bed and discussed exchanging sex for money, with the price again specified as $140. George said that she had worked similar operations five or six times, but Petitioner gave her an odd vibe like she had never experienced.

The price of $140 was again specified, and Petitioner said he had the money in his pocket. George told him to put the money on the counter, and she would go in the bathroom and change. He then grabbed her arm as if he wanted to talk for a minute. He said, "You have to be careful doing stuff like this." George asked what he meant, and Petitioner said, "You have to be careful doing stuff like this because it's a lot of crazy people out there and they'll do dangerous stuff to you." She thanked him for the information then went in the bathroom and locked the door.

The team of officers in the next room immediately entered and arrested Petitioner. Robert Perry testified that he was a state police officer who was on that team. He said that when officers entered the room to make the arrest, Petitioner threw his hands up and said, "She gave me the knife, she gave me the knife." The officers did not know that he had a knife until he said that, and they then removed a knife from his pants. Perry was shown Exhibit S-5 and said that he remembered the knife looking like that and having a serrated blade and black handle. Exhibit S-5 was then introduced into evidence. Perry testified that Petitioner did not have any money on him. Officer George testified that she did not actually see Petitioner being searched, but she was advised that he had a knife in his waist and did

not have any money.  The prosecutor showed George Exhibit S-5, which she identified as the serrated edge knife she saw that night.

### G.  Brittany Hughes, SANE Nurse (Tr. 241-68)

Brittany Hughes testified that she is a registered nurse and works as a SANE (sexual assault nurse examiner) who collects forensic evidence from victims of sex crimes.  She reported to a hospital emergency room, spoke with a detective on the case, and then went to T.A.C.'s room to introduce herself and start the process of collection.  She collected clothing, took swabs from different areas of the body to collect potential DNA samples, and took photos of the victim.  Nurse Hughes testified that the photos showed bruising and lacerations in the vaginal and anal areas, as well as other parts of the body.  She said there were numerous ways such bruises could be caused, but according to T.A.C. they were caused by the attack.  Hughes said that the bruising fit with a forcible assault, but she admitted on cross-examination that it was possible for the injuries to have been caused by consensual sex.

### H.  Jessica Esparza, DNA Expert (Tr. 275-83)

Jessica Esparza testified that she was the DNA technical leader at the area crime lab.  She examined the swabs that were collected by Nurse Hughes.  She testified that the vaginal swab was consistent with the Y chromosome obtained from the reference sample of Petitioner, meaning he and all males within his paternal lineage could not be excluded as the donor.  She said that meant that 99.85% of African American males could be excluded as contributing the material.  Petitioner was in the .15% that could not be excluded.

**I. Analysis**

In evaluating the sufficiency of the evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

Petitioner challenged the sufficiency of the evidence on direct appeal. The state appellate court set forth the Jackson standard and conducted a detailed review of the testimony and evidence. The court concluded that, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to convict Petitioner of aggravated rape of T.A.C. The court pointed to the scientific evidence, the testimony regarding the victim's demeanor after the encounter, and the testimony about Petitioner's previous involvement in a similar situation at the Horseshoe hotel. The court pointed out that T.A.C. and Ms. Fisher were shown knives seized from Petitioner's residence, and they testified that they resembled the knife used during the rape. The officers from the Horseshoe matter testified that Petitioner had a similar knife on him during that incident. The court also noted the testimony of T.A.C. and Ms. Fisher. State v. Morning, 149 So.3d at 932-33.

Petitioner argues that he and T.A.C. engaged in consensual sex, and T.A.C. became upset when he did not make the required payment. She then fled the room and claimed

that she had been raped. Petitioner's arguments are based largely on a challenge to the credibility of T.A.C. and Ms. Fisher; there was no testimony from Petitioner or anyone else that supported Petitioner's version of the events. The state appellate court noted that "the jury clearly chose to accept T.A.C.'s testimony as credible and presumably accepted her and Ms. Fisher's explanations that they were initially reluctant to admit they were escorts for fear of going to jail or that the authorities would not believe T.A.C. had been raped." The court added, "It was within the discretion of the trier of fact to make such credibility determination, and this Court will not disturb this determination on appeal." State v. Morning, 149 So.3d at 933.

Petitioner's sufficiency of the evidence claim was adjudicated on the merits in the state court, so he is entitled to habeas relief only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

The state court was correct that "it is the responsibility of the jury—not the court— to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). Furthermore, "under Jackson, the assessment of the

credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995). A rational juror, viewing the evidence in the light most favorable to the prosecution, could have found Petitioner guilty beyond a reasonable doubt. And the state court's decision was not an objectively unreasonable application of Jackson. To the contrary, it was an entirely reasonable decision. Petitioner's challenge to the credibility of the witnesses, and his other challenges to the weight that should be afforded to various items of evidence, do not come close to satisfying the Jackson standard and the even more demanding requirement of Section 2254(d). His challenge to the sufficiency of the evidence does not permit habeas relief.

**Excessive Sentence**

Petitioner's petition (Doc. 5, p. 7) lists ground two as whether the trial court erred by imposing an unconstitutionally harsh and excessive sentence. In support, Petitioner wrote that he was convicted by only ten members of his jury but was incarcerated for life, which he asserted was unconstitutionally excessive. His memorandum in support of the petition does not contain any argument on this issue.

Petitioner argued on direct appeal that his life sentence was excessive because he was convicted by only ten of twelve jurors. The state court noted that it is within the legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies, and the courts must apply those punishments unless they are found to be unconstitutional. It noted that the mandatory life sentence for aggravated rape had withstood repeated challenges based on the Louisiana constitution. Finally, the court found that Petitioner did not show that his circumstances were an exception to the constitutional

application of the sentence, and the 10-2 verdict was not an unusual circumstance warranting a deviation from the mandatory sentence imposed by the legislature. State v. Morning, 149 So.3d at 933-34.

Petitioner's failure to brief this claim warrants denying it as waived or abandoned. Lookingbill v. Cockrell, 293 F.3d 256, 263 (5th Cir. 2002) ("Where a habeas petitioner fails to brief an argument adequately, we consider it waived."); Pea v. Cain, 2017 WL 1197872, *12 (M. D. La. 2017) (collecting district court decisions that found waiver where a habeas claim was not adequately briefed). The claim also lacks any merit. Petitioner argued his excessive sentence claim in state court in terms of Louisiana constitutional law, but federal habeas relief is not permitted for a mere violation of state law. Petitioner must establish a violation of federal constitutional law. Estelle v. McGuire, 112 S.Ct. 475, 479-80 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."). Petitioner has not cited, and the court is not aware of, any authority for the proposition that a mandatory life sentence for an aggravated rape conviction reached by a 10-2 verdict violates the federal constitution. This claim must be rejected.

**Ineffective Assistance of Trial and Appellate Counsel**

    **A. Relevant Facts**

Police obtained an arrest warrant for Petitioner and a search warrant for his home. They arrested Petitioner at the home, and the search of the home located two knives that were admitted into evidence as Exhibits S-2 and S-3. Detective Jones said that the first one was a steak knife, six to seven inches long, with a black handle; the second one was about ten inches long and also had a black handle. The officers testified that the knives

were seized because they were similar to the one described by the victim, but Detectives Jones and McDonald testified that they did not believe these particular knives were used in the crime. Tr. 165-68, 177, 202-05, & 213. Trooper Perry testified about the knife that was taken from Petitioner during the Horseshoe operation, and that knife, described as a serrated knife with a black handle, was admitted as Exhibit S-5. Tr. 301-02.

Petitioner argued in his post-conviction application that his trial counsel was constitutionally ineffective when he did not argue that the prosecution should have been barred from introducing Exhibit S-5 because it was from a previous incident, making it irrelevant and prejudicial. He also argued that appellate counsel was ineffective for failing to raise the issue on direct appeal. Tr. 619-20. Appellate counsel, Lee Harville, sent a letter to Petitioner in which he stated that he "did not raise a claim related to the 404(b) evidence because I did not feel that there was error in relation to the admission of the evidence." Doc. 5-2, p. 9.

### B. State Court Decisions

The state trial court considered these and several other post-conviction claims. It appears that Petitioner's original draft of his post-conviction application referred to Exhibit S-5 as "three exemplary knives," but there are edit marks to indicate that he revised the claim to correctly refer to S-5 as being only the one knife related to the Horseshoe incident. The trial court's opinion continued to refer to S-5 as three exemplary knives.

Louisiana Code of Evidence Article 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Article 404(B) provides that

evidence of other crimes, wrongs, or acts is generally not admissible but may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. The trial court took into consideration Rule 404(B) as well as the principles of Strickland.

To establish ineffective assistance of trial counsel, Petitioner must demonstrate both deficient performance by his counsel and prejudice resulting from that deficiency. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). To show that his trial counsel's performance was deficient, he must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., 104 S.Ct. at 2064. To demonstrate prejudice from his trial counsel's deficient performance, he must show that his attorney's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. Failure to establish either prong defeats the claim. Id.

Appellate counsel's performance is judged under a similar standard. Effective appellate counsel does not have to raise every non-frivolous ground on appeal. He need only perform in a reasonably effective manner. Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998) (citing Evitts). When a petitioner claims that counsel omitted an issue that should have been argued, the petitioner must show that had the issue been raised there was a reasonable probability that he would have won on appeal. Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).

The trial court, on post-conviction review, noted that the appellate court had discussed the knives as among the substantial evidence supporting the conviction. This persuaded the trial court that the knife evidence was admissible, which defeated the deficient performance prong of the claim. The court also pointed to the testimony of T.A.C. and Ms. Fisher that the knives resembled the knife that Petitioner used during the crime, and there was testimony from police officers that Petitioner possessed a similar knife during the incident at the Horseshoe.

The trial court thus denied the postconviction claims that faulted trial and appellate counsel for not excluding S-5. Tr. 645-47. Petitioner applied for a writ, and the appellate court responded: "On the showing made, this writ is hereby denied." Doc. 5-2, p. 42. The Supreme Court of Louisiana denied a writ application in a per curiam that stated Petitioner "fails to show that he received ineffective assistance of counsel" under the standard of Strickland. Id. at pp. 44-45.[1]

**C. Habeas Analysis**

The claims of ineffective assistance of trial and appellate counsel were adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). The

---

[1] The record of the state court proceedings submitted by the State does not include any post-conviction proceedings beyond the trial court's decision. Fortunately, Petitioner included the relevant documents as exhibits to his petition.

Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009). For the federal court to grant relief, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quotation marks removed).

"If this standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 131 S.Ct. 770, 786 (2011). Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. Id. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

Petitioner cannot overcome the demanding habeas standard with respect to these claims. There may have been am argument that counsel could have made in an effort to exclude the S-5 Horseshoe knife, but the prosecution had a sound argument that it was relevant because it was taken from Petitioner in the course of a similar encounter, and the knife bore a strong resemblance to that described by the victim and those found in Petitioner's home. The evidence indicated that Petitioner had access to black handled knives of that description. There was also no confusion or suggestion that the knife seized in the Horseshoe matter was presented as the same knife used in the offense at issue. That was made abundantly clear to the jury. The state court's rejection of these ineffective assistance of counsel claims was entirely reasonable. It cannot be said that they were an

objectively unreasonable application of Strickland to the facts and law, so habeas relief is not permitted on these claims.

Accordingly,

It is recommended that the petition for writ of habeas corpus be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the

applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

  THUS DONE AND SIGNED in Shreveport, Louisiana, this 25th day of October, 2021.

                    Mark L. Hornsby
                    U.S. Magistrate Judge